June 1820.          COURT OF APPEALS, JUNE TERM, 1820.

Davis
vs
Jacquin, &c

DAVIS vs. JACQUIN & POMERAIT.

Whether the owner of a slave has been a sojourner in Pennsylvania with such slave, and has sent him away within six months, within the meaning of the statute of that state of 1780, ch. 870, are facts to be left to the jury. Where the laws of this state, and of any other, differ, the court here is bound to administer the former. If a slave, belonging to a citizen of this state, should be declared free by the judgment of a court of competent jurisdiction in Pennsylvania, when he would not be entitled to freedom under the laws of this state—Quere--whether such judgment would be binding here? By the act of 1798, ch. 101, the disabilities of infancy are not removed, except in the particular cases therein expressly provided. A female under the age of 21, cannot dispose of her personal property, though entitled to the possession of it at 16.

APPEAL from *Baltimore* city court from a judgment in that court, on a *petition for freedom.* The petitioner, (the appellant,) claimed his freedom under the laws of *Pennsylvania;* and, to support his claim, proved to the jury, that he was, in September 1813, the property of Miss *Eleanor Davidson,* who was the step-daughter of *J. Pinkney,* and lived and resided in his family, in *Baltimore.* That on the 23d of September 1813, *Pinkney* removed to *Carlisle,* in *Pennsylvania,* where he has resided ever since. That Miss *Davidson* went with *Pinkney* to *Carlisle,* when he moved his family there, and lived with him about two years before she returned to this state. That at the time *Pinkney* moved to *Carlisle,* he took with him the petitioner, and kept him there, as a servant in his family, until the 24th of February 1814, when he was sent back to *Baltimore* from *Carlisle,* and in 1818 was sold to the defendants by *R. Casey,* the agent of Miss *Davidson,* and after she had arrived at the age of 21 years. The petitioner further offered in evidence two acts of the legislature of *Pennsylvania,* to wit, the acts of 1780, *ch. 870,* and of 1788, *ch. 1334.* The defendants then proved to the jury, that Miss *Davidson,* at the time she went to *Carlisle* with *Pinkney,* was under the age of 21 years; being only 17 years old; that she then held, and now holds, real and personal property in this state, and is a native thereof. That she has a number of relations residing in this state; and has alternately resided in *Pennsylvania,* and in this state, since her first removal to *Carlisle,* and has spent two winters in *Annapolis* since 1813. That she was never consulted on the petitioner's being carried to *Pennsylvania,* and never gave her consent, or any authority to *Pinkney,* or any other person, to carry the petitioner to that state. The petitioner, by

his counsel, then prayed the court to instruct the jury, that upon the whole matter, as above stated in evidence, he was entitled to his freedom. But the court, [*Brice*, Ch. J. and *M<sup>c</sup>Mechen*, A. J.] refused to give the instruction, but gave the jury the following direction:— That if they should be of opinion that Miss *Eleanor Davidson* was under 21 years, and a sojourner in the family of *Pinkney*, her father-in-law, in *Pennsylvania*, and sent the petitioner back to this state within six months from the time of carrying him to *Pennsylvania*, they ought to find a verdict for the defendants; or, if they should be of opinion, that *Pinkney*, without the consent or authority of Miss *Davidson*, and during her infancy, carried the petitioner to *Pennsylvania*, and sent him back to this state within six months thereafter, they ought also to find a verdict for the defendants. The petitioner excepted, and the verdict and judgment being against him, he appealed to this court.

The case was argued before BUCHANAN, EARLE, JOHNSON and DORSEY, J.

*Raymond*, for the appellant. By the *tenth* section of the act of *Pennsylvania* of 1780, ch. 870, referred to in the bill of exceptions, it is enacted, "that no man or woman, of any nation or colour, except the negroes or mulattoes who shall be registered as aforesaid, shall, at any time hereafter, be deemed, adjudged or holden, within the territories of this commonwealth, as slaves or servants for life, but as free men and free women, except the domestic slaves attending on the delegates in congress from the other *American* states, foreign ministers and consuls, and persons passing through or sojourning in this state, and not becoming residents therein, and seamen employed in ships not belonging to any inhabitant of this state, nor employed in any ship owned by any such inhabitant; provided such domestic slave be not alienated or sold to any inhabitant, nor (except in case of members of congress, foreign ministers, and consuls,) retained in this state longer than six months." This law was amended by an act passed in 1788, ch. 1334, which declares "that the exception contained in the *tenth* section of the aforesaid act, relating to domestic slaves attending upon persons passing through or sojourning in this state, and not becoming resident therein, shall not be deemed or taken to extend to the slaves of such persons as are inhabitants of or resident in this state, or who shall come

JUNE 1820.<br>Davis<br>vs<br>Jacquin, &c

June 1820. here with an intention to settle and reside; but that all and
every slave and slaves, who shall be brought into this state
by persons inhabiting or residing therein, or intending to
inhabit or reside therein, shall be immediately considered,
deemed and taken, to be free, to all intents and purposes."
Our act of assembly passed in 1798, *ch.* 101, *sub ch.* 12,
*s.* 1, 15, provides, that guardianship of female infants shall
cease at sixteen years of age, and that "on the ward's ar-
riving at the age aforesaid, the guardian shall exhibit a final
account to the orphans court, and shall deliver up, agreea-
bly to the court's order, to the said ward, all the property
of such ward in his hands, including bonds, and other se-
curities; and on failure, his office bond shall be liable, and
he shall also be liable to attachment and fine." The pe-
titioner founds his claim to freedom upon these acts of as-
sembly; and the main question is, whether Miss *Davidson,*
at the age of 17 years, was an infant, or of full age, under
the laws of this state. If an infant, then it is admitted
that she could do no act to prejudice her property in this
slave, nor could the act of Mr. *Pinkney,* her step-father,
affect her rights. The law has been so settled. But if she
was of full age, under our act of assembly, so as to have
the complete and absolute control of her property, then
could she make a legal disposition of her slaves, and by
consenting that the petitioner should go to *Pennsylvania* to
reside, did such an act as, under the laws of that state,
entitles him to his freedom; and any right which the peti-
tioner may have acquired in *Pennsylvania* will be recognis-
ed by this court. See *Negro David vs. Porter,* 4 *Harr.* &
*M'Hen.* 418. Was Miss *Davidson* then, at the age of 17
years, of lawful age to do an act which should enure to the
freedom of the petitioner? If so, then is the opinion of
the court below, and their instruction to the jury, errone-
ous; for that opinion requires, that the jury should find
Miss *Davidson* to have been 21 years old at the time the
petitioner was taken to *Pennsylvania,* in order to be entit-
led to his freedom, and indeed the opinion is erroneous at
any rate; for it requires the jury to find that the petitioner
remained in *Pennsylvania* six months in order to be entit-
led to his freedom, which is in direct opposition to the sta-
tute of *Pennsylvania,* which provides, that slaves brought
into the state, by persons coming there to reside, shall im-
mediately become free to all intents and purposes; and from

Davis
vs
Jacquin, &c

the facts proved, it was certainly competent for the jury to find, that Miss *D.* did go to *Pennsylvania* to reside. She did in fact reside there two years before she returned to this state at all, and it continued to be her home for several years afterwards. If then the jury should have been of opinion, from the evidence, that Miss *D.* went to *Pennsylvania* to reside, then was the petitioner free the moment he sat foot in the state, provided Miss *D.* legally could and did consent to his going. Under our act of assembly, guardianship of female wards ceases at the age of sixteen years, and the act requires all her property then to be delivered into her possession. The necessary consequence is, that the disabilities of infancy must also cease at that age; for it would be a strange absurdity to invest a female at that age with the legal possession of her property, and at the same time impose on her the legal disabilities of infancy, so as to disable her from making any use or disposition of that property. The object of the statute was to confer a privilege upon females—to make a distinction between males and females—guardianship of males continues till 21—that of females ceases at sixteen; but to withdraw the protection of a guardian from females; without conferring on them the right of acting for and protecting themselves, would be to put them without the pale of law. If a female, at the age of sixteen, is to have the legal possession of her property without the legal ability to use it, or bind herself by contract respecting it, then must her lands lie waste for the want of culture, for no man would rent them of her, for her contracts would be voidable; and any person who should enter upon them, in pursuance of such contract with her, would be liable to be turned off at pleasure. Her slaves must go at large, because she could not contract for their hire—her personal property must lie useless on her hands, because she could make no contract to dispose of it—Her bonds and notes must remain uncollected, because she could not bring suits for their collection; for an infant cannot sue, except by guardian, and she has none; and the law says she shall have none; and it seems absurd to say she may sue by *prochein ami,* when the law says she shall have no guardian.

Miss *D.* must, therefore, be considered of full age at sixteen. The disabilities of infancy were then removed, so far as relates to her property, and she had a legal capa-

June 1820.

Davis
vs
Jacquin, &c

June 1820. city to bind herself by contract at that age. She could then make a final settlement with her guardian, which would bind her. She could have manumitted the petitioner by deed—could have sold him, and of course could assent to his going to *Pennsylvania*. Our act of assembly of 1796, *ch.* 67, *sec.* 29, provides, "that any person *possessed* of any slave or slaves of healthy constitution, &c. may, by writing under his, her, or their hand and seal, evidenced, &c. grant to such slave or slaves his, her, or their freedom." It must be presumed, that the legislature used the word *possessed*, in this statute, in the same sense that they used equivalent words in the testamentary system above quoted, where they say, "the guardian shall deliver up to the said ward, all the property of the said ward;" which is equivalent to saying, the ward shall have the possession of her property. If this be so, then was Miss *D.* at the age of sixteen, competent to execute a deed of manumission to the petitioner, by the express provision of the statute; and if competent to give her assent to a deed of manumission, then was she competent to give her assent to the petitioner's going to *Pennsylvania*. Whether it was wise, or unwise, for the legislature to remove the disabilities of infancy, from females, at the age of sixteen, is foreign to the present question, nor can it ever be proper to discuss such a question before this tribunal. It is the duty of this court to administer the law, and not to make it. The legislature has said, that guardianship of female wards shall cease at sixteen years of age, and that their property shall then be delivered into their possession. The plain and obvious meaning of this language is, that infancy, and the disabilities of infancy, shall then cease, in regard to their property; and that courts of justice are bound to give it this construction, is manifest from the absurdity and mischiefs of a different construction. The first branch of the opinion of the court below, is therefore erroneous, because it requires the jury to find that Miss *Davidson* was 21 years of age at the time the petitioner was sent to *Pennsylvania,* and that he remained there six months, before they could find that he was free. The second branch of the opinion is erroneous, for the same reason, for although it leaves the question to the jury, whether the petitioner was taken to *Pennsylvania* with or without the authority and consent of Miss *D.* still the question as to infancy, (although obscure-

Davis
vs
Jacquin, &c

iy expressed,) and the question as to sending back to this state, within six months, is put upon the same ground in this as in the former branch of the opinion; whereas the direction of the court to the jury should have been, that if they believed from the evidence that Miss *D.* was sixteen years of age, or upwards, and went to *Pennsylvania* to reside, and that the petitioner was taken there by her authority, or with her knowledge and consent, then they must find that the petitioner is free.

*Pinkney,* for the appellees. The act of 1796, *ch.* 67, *s.* 7, is in the disjunctive, and gives rise to two questions: 1. Whether or not Miss *Davidson* was an infant; and 2. If she was not an infant, was the petitioner removed to *Pennsylvania* without her consent or authority? The act says, if she was an infant, the law of *Pennsylvania* could not operate. She had only a capacity to do particular acts under the age of 21, and must be considered an infant for all other purposes. An infant may contract for necessaries. So a married woman, by contract, may make her will—Still she is a *feme covert.* These are exceptions out of the cases of infancy and *femes covert,* but do not affect the general law with regard to them. A female infant may take her property at the age of 16, but she can do no act to prejudice herself. The law guards and protects her. Her general character of infancy remains until she is 21—while under that age, no matter how many exceptions are carved out, still she is an infant. The law enables her to make beneficial contracts, but none to prejudice her. If then she did consent that the petitioner should be taken to *Pennsylvania,* it cannot affect her. If she is within the exception of the act of 1796, the laws of *Pennsylvania* cannot apply to her. *Smith vs. Williamson,* 1 *Harr.* & *Johns.* 147. *Hancy vs. Waddle,* in this court, May 1815. *Mahoney vs. Ashton,* 4 *Harr.* & *M'Hen.* 323.

*Raymond,* in reply. It has been said that Miss *Davidson* was an infant, and that the law was her guardian. The law is a guardian to us all. Where any person is defrauded, the law is his guardian to protect his rights. Miss *Davidson* might, by her will, have manumitted the petitioner, and if so, she could send him to *Pennsylvania,* that he might thereby become free under the laws of that state.

The act of 1796 speaks of slaves being carried out of the state by other persons than an executor, &c. but it says nothing of the infant herself carrying or sending the slave out. If then she did send the petitioner out of the state, she is not within either the letter or spirit of that act.

JOHNSON, J. The general court, in the case of *Lowe vs. Gist*, decided, that a female, at the age of 18 years, could not execute a bill of sale of her slaves *(a)*.

A bill of sale executed by a female under the age of 21 years, but above the age of 16, is voidable by her on her arrival at the age of 21.

(a) *Lowe vs. Gist*, General Court, May term 1798. This case came up on a writ of error to *Prince-George's* county court, and was an action of *replevin*, brought by the plaintiff in error, for a negro slave named *Charles* The defendant pleaded *non cepit* and *property*, and issues were joined. At the trial the plaintiff offered in evidence a deed of indenture, dated the 23d of August 1774, executed by *Harry, Ann,* and *Mary Ann Lowe*, to *Enoch Magruder* and *Michael Lowe*, and duly acknowledged and recorded, whereby, in consideration that *Magruder* and *Lowe* had engaged and undertaken to pay and satisfy to several creditors of *Harry, Ann* and *Mary Ann Lowe*, and in consideration of five shillings current money, they, in order to secure and save harmless and keep indemnified *Magruder* and *Lowe*, conveyed and transferred to them certain parcels of land, and several negro slaves, and amongst others the negro slave mentioned in the declaration in this cause; covenanting, that *Magruder* and *Lowe*, their heirs, &c might enter into and take possession of the lands and negroes, or any of them, and the same, or any of them, to sell and dispose of at private or public sale, and when sold, convey and transfer to the purchaser, &c. It was admitted by the parties, that the negro slave named *Charles* was, at the execution of the indenture, the property of *Mary Ann Lowe*, and that after the execution of the said indenture she intermarried with *John Gist*, the defendant; and that she was, at the time of the execution of the said indenture, under the age of *twenty one* years, and above the age of *sixteen* years. The plaintiff then prayed the direction of the court to the jury, that if the said *Mary Ann Lowe*, at the time of the execution of the said indenture, was above the age of *sixteen* years, although she was under the age of *twenty-one* years, that the said indenture was good and available in law to pass the said negro slave named *Charles*, and that said indenture could not be avoided by her, or those claiming under her, on account of the non-age aforesaid. But the county court, [*Stone*, Ch. J.] refused to give this direction; but directed the jury, that if they were of opinion that *Mary Ann Lowe*, at the time of the execution of the indenture was under the age of twenty one years, and above the age of sixteen years, that then the indenture, in point of law, was voidable by her, and that she, after her full age, and before her intermarriage, and that she and her husband after her intermarriage, might legally avoid it, if it had not been confirmed by her after her coming of age, or by her husband after their intermarriage. To this opinion the plaintiff excepted; and the verdict and judgment being for the defendant, the present writ of error was brought by the plaintiff.

*Kitty, Nicholls,* and *Buchanan*, for the plaintiff in error.

*Key* and *Shaaff*, for the defendant in error.

THE GENERAL COURT *affirmed* the judgment of the County Court.

DORSEY, J. cited *Stewart vs. Oakes*, decided in this court under the laws of *Virginia(b).*

The opinion of the court was delivered by

DORSEY, J. [After recapitulating the facts, he proceeded:] The court below gave the two following hypothetical directions to the jury, that if they should be of opinion, that Miss

*(b) Stewart vs. Oakes.* Court of Appeals, December Term, 1813. It was an appeal from the Court of Oyer and Terminer, &c. for *Baltimore* county, from a judgment rendered in that court on a petition preferred by the present appellee, claiming his freedom because of his having been removed by the defendant, (the appellant,) from this state into the state of *Virginia,* and thence imported into this state. There was a verdict for the petitioner, subject to the opinion of the court on the following case, viz. It is admitted that negro *Robert,* the petitioner, was the slave of the defendant, who is a citizen of this state, and resided therein prior to the 10th of January 1783, and has resided there ever since. That he owns a stone quarry in the state of *Virginia,* where he has been in the habit of taking the petitioner, for the purpose of working in the quarry, for a number of years past, four or five weeks in the spring of every year, making the time of the petitioner's being in *Virginia,* in the whole, upwards of one year. The defendant never resided in *Virginia,* except for the purpose of quarrying stones as aforesaid, and always returned to this state, (where his family constantly remained,) as soon as he got a sufficient number of stones to supply his manufactory at *Baltimore.* That the record annexed, contains a true and just copy of the laws of *Virginia* relative to slaves; and that the petitioner never applied to any court of record or competent tribunal in *Virginia,* for the purpose of obtaining his freedom under the laws of that state. The petitioner was always brought back to this state by the defendant without being compelled thereto by any force or violence; and that the several times herein before mentioned, in which the petitioner remained in *Virginia,* were subsequent to the passage of the above mentioned law of *Virginia.* The petitioner was taken by the defendant in the month of March 1801, to said quarry, for the purpose of quarrying, and remained there until the month of August following, when he returned to this state, where he continued about two weeks, and again returned to *Virginia,* and remained working at the quarry until November following, when he again came back to this state.

By the law of *Virginia,* referred to in the above statement, passed on the 17th of December 1792, *ch* 103, *s.* 2, "Slaves which shall hereafter be brought into this commonwealth, and kept therein one whole year together, or so long at different times as shall amount to one year, shall be free." By the *fourth* section, it is provided, "that nothing in this act contained shall be construed to extend to travellers, and others, making a transient stay, and bringing slaves for necessary attendance, and carrying them out again."

THE COURT OF OYER AND TERMINER, &c. [*Dorsey,* Ch J.] gave judgment on the case stated for the petitioner. From which the defendant appealed to this court.

The case was argued here before CHASE, Ch. J BUCHANAN, NICHOLSON, EARLE and JOHNSON, J. by *Purviance* for the appellant, and T. BUCHANAN for the appellee.

THE COURT OF APPEALS *affirmed* the judgment of the court of oyer and terminer, &c.

A slave carried at different periods to *Virginia,* by his owner residing in this state, and employed in working at his stone quarry, the several periods amounting in the whole to one year, such slave is entitled to his freedom under the laws of *Virginia.*

*Davidson* was under twenty-one years of age, and a sojourner in the family of *Pinkney*, (her father-in-law,) in *Pennsylvania*, and sent the petitioner back to this state within six months from the time of carrying him to *Pennsylvania*, they ought to find for the defendants; or if they should be of opinion that *Pinkney*, without the consent or authority of Miss *Davidson*, and during her infancy, carried the petitioner to *Pennsylvania*, and sent him back to this state within six months thereafter, they ought to find a verdict for the defendants.

By referring to the statutes of *Pennsylvania*, to wit, the *tenth* section of the act, entitled, "An act for the gradual abolition of slavery," passed in the year 1810, *ch.* 870, and the *second* section of the act, entitled. "An act to explain and amend an act, entitled, An act for the gradual abolition of slavery," passed in the year 1788, *ch.* 1334, it will be found, that the legislature of that state have, by express words declared, that the domestic slaves of persons, sojourning in that state, shall not be emancipated from bondage, provided such slaves be not alienated or sold to any inhabitant of that state, nor retained in the state longer than six months. Whether Miss *Davidson* was a sojourner in *Pennsylvania* during the time the petitioner remained there, and if she was, whether the petitioner was sent back to this state within six months after being carried into *Pennsylvania*, were facts proper for the consideration of the jury, and were by the court referred to their determination. And if such were the facts, the petitioner can have no claim, under the laws of *Pennsylvania*, to his freedom. And as the court below did so declare, they did not err in the direction first given by them to the jury.

Let us now examine whether the other opinion was erroneous.

The *seventh* section of the act of assembly of this state, entitled, "An act relating to negroes, and to repeal the acts of assembly therein mentioned," passed in the year 1796, *ch.* 67, declares, "that if any negro, or other slave, hath been, or may hereafter be, carried out of this state by an executor, administrator or guardian, or by any other person or persons, during the infancy, or without the consent or authority of the real owner or proprietor of such negro, or other slave, it shall and may be lawful for such,

proprietor or owner, at any time thereafter, to bring said negro, or other slave, into this state again, and have and enjoy the said negro or other slave as his property." This act, therefore, most explicitly declares, that the right of an infant, in his negro slave, shall not be divested by his being carried out of the state by any person whatever. This being the law, it would be useless to consider, what would be the operation of the laws of *Pennsylvania* in such a case. If the legislative enactments of this state and another state should differ, it cannot be made a question here which shall prevail. Where there is no constitutional barrier, we are bound to observe and enforce the statutory provisions of our own state. What would have been the legal effect of a judgment rendered in *Pennsylvania*, declaring the petitioner to be free, (if such a judgment had been rendered,) the court do not mean to decide.

It has been urged by the appellant's counsel, that Miss *Davidson* was not an infant at the time the petitioner was carried to *Carlisle* by *Pinkney*, she then being seventeen years of age, and the legal infancy of females ceasing at the age of sixteen. That the minority of females did not cease at that age, under the principles of the common law, is a proposition too clear for inquiry. But it is said, that the act of 1798, *ch.* 101, has made an alteration in the common law; and the appellant, in support of this position, has relied on that part of the act, which declares that the orphans court shall appoint guardians to females until the age of sixteen, or marriage; and that on the female attaining such age, the guardian shall deliver up to her all the property of his ward, including bonds, and other securities. That this act has not, in terms, declared, that the infancy of females shall cease at the age of sixteen, will be admitted; and it is difficult to conceive why the legislature, if they intended to destroy this important feature of the common law, did not pointedly declare their intention, instead of leaving it to be inferred by reasoning. That such was not their intention, with reference to all females, is most evident, because they refer to, and acknowledge the validity of testamentary guardianships created under the statute of 12 *Charles* II, *ch.* 24; and it is well known that parents under this statute may appoint guardians to their female children, until they arrive at the age of twen-

June 1820.

Davis
vs
Jaequin, &c
ty-one years. It may be asked, why make this distinction? If the common law principle operated unkindly on the female sex, why emancipate a part of them from its disabilities, and leave the rest to suffer under its uncourteous restraints? The object of the law was to enable an infant female, at the age of sixteen, to receive from her guardian, and take into her possession, her real and personal estate. So far the law conferred on her a new capacity; but this capacity does not destroy the state of legal minority, because it is consistent with it. While the law gives to her the power of receiving the possession of her property, it is silent as to the *jus dis ponendi*, except in the instance of devising her real estate, which she is empowered to do at the age of eighteen. If her infancy ceased at sixteen years, why, I pray, withhold from her the power of disposing of her lands by will before eighteen? If she ceases to be an infant at sixteen, she may immediately thereafter convey her lands by deed; and thus the strange inconsistency is introduced, that a female has legal capacity to convey her land by deed, when she is sixteen years of age, but cannot devise them before she arrives at the age of eighteen. Neither is the provision of the act, which incapacitates persons under the age of eighteen from acting as administrator, consistent with the notion of the appellant's counsel.

It has been further urged, that infants are bound to sue by guardian, and as the guardianship ceases at sixteen, their infancy must cease at the same time, or they are deprived of the capacity of suing. This argument is founded on a twofold error; first, by supposing that an infant can only sue by guardian; and secondly, that the guardian of the person must be the guardian *ad litem*. By the common law, infants were obliged to sue by guardian; but they were enabled by the statute of *Westminster* the 2d. to sue by *prochein amy;* and the guardians of the person, and guardians *ad litem*, are essentially different in their creation and powers. The power of appointing the latter is incident to all courts, and they are admitted, by the court for the particular suit, on the infant's personal appearance, without inquiring whether the person admitted is the guardian of the person of the plaintiff. *Coke Litt.* tit. *Soccage,* §. 123, *Note 16.*

How far the rights of Miss *Davidson*, if she had been adult, would have been affected by the acts of her father-in-law, the court do not mean to decide.

The court are of opinion, that there is no error in the second opinion delivered by the court below.

JUDGMENT AFFIRMED.

*June 1820.*