GEORGE PLATER vs. WILLIAM B. SCOTT.—*June*, 1834.

P, who was guardian until 1817 to the plaintiff, received in 1828 from the board of commissioners appointed to distribute the fund paid to the *United States*, by virtue of the convention of 1826, the sum of $3000, as compensation paid by the *British* government for certain captured and deported negroes formerly the property of the plaintiff, and paid the same to the defendant. The slaves were carried of from the State, during the war in 1814, by the naval officers of *Great Britain*. The plaintiff petitioned for the benefit of the insolvent laws in 1822, and was finally discharged in 1823. The defendant was his permanent trustee. The action was brought to recover the $3000, and the county court instructed the jury, that if they should believe the plaintiff was *regularly and legally discharged under the insolvent laws of this State*, then the plaintiff was not entitled to recover. Upon appeal this instruction was reversed, and the permanent trustee held entitled to the funds.

It is error in the county court to submit to the belief of the jury, a question of law, or a mixed question of law and fact.

APPEAL from *Saint Mary's* county court.

This was an action for money had and received, instituted by the appellant against the appellee, on the 17th *February*, 1829. Issue was joined upon the plea of *non-assumpsit*.

At the trial the plaintiff proved, that the late *John R. Plater* (who was guardian to the plaintiff during his minority, which terminated in 1817) received from the board of commissioners, appointed to distribute the fund paid to the *United States*, by virtue of the provisions of the convention of 1826, commonly called *Gallatin's Convention*, the sum of about $3000, in the year 1828, as compensation paid by the *British* government for certain captured and deported negroes, formerly the property of the plaintiff; and paid the said sum of money to the defendant, *Scott*, as trustee for the creditors of the plaintiff, in 1828. The defendant then proved that the negroes deported, as aforesaid, by the naval officers of *Great Britain* in the year 1814, in the late war, were the property of the plaintiff, prior to his petition for the benefit of the insolvent laws of *Maryland*. That the plaintiff petitioned for the benefit of those

laws on the 10th of *August,* 1822, and was finally discharged on the 14th of *March,* 1823. That the defendant was appointed his permanent trustee on the day of his final discharge, and having given bond as such with approved security, entered upon the discharge of his duties; and that the negroes above referred to were included in the schedule returned by said *Plater.* The defendant then prayed the court to instruct the jury, that if they should believe from evidence that the plaintiff was regularly and legally discharged under the insolvent laws of this State, upon his insolvent petition as aforesaid, that then the plaintiff is not entitled to recover. This instruction (STEPHEN, Ch. J., and KEY, A. J.) gave,—the plaintiff excepted, and the verdict and judgment being against him, he prosecuted the present appeal.

The cause was argued before BUCHANAN, Ch. J., and MARTIN, ARCHER, and DORSEY, J.

*Vernon H. Dorsey,* for the appellant, contended.

1. The court below erred, in submitting the legality of the plaintiff's discharge to the jury. It was a question of law, or a mixed question of law and fact, and in either aspect the decision was wrong.

2. The plaintiff at the time of his discharge had not such an interest in the subject of the controversy, as could be assigned, either according to the ordinary principles of the common law, or the insolvent laws of this State. The capture of the negroes by the naval officers of *Great Britain* extinguished the plaintiff's right of property, which became vested in the *British* government. The right *flagrante bello,* to seize property as an equivalent for damages, losses, &c. incurred in the prosecution of a war, is recognised by *Grotius* and other writers.

The question is, had *Plater* any assignable right at the time of his discharge. If he had any interest, it was in virtue of the treaty of peace between *Great Britain* and the

*United States.* By that treaty *Great Britain* stipulated to restore any negroes, or other private property taken during the war. That government having denied her liability to pay for the deported negroes captured during the war, the *United States* renewed the negotiation on the subject in 1818, which led to a convention, by which the two governments agreed to refer the subject to some friendly power, by whom it was decided, the indemnity should be made, for all property within the waters of the *United States* at the time of the ratification of the treaty. Difficulties occurring in the execution of this award, *Mr. Gallatin* in 1828, negotiated a treaty which was received by the *United States* in fulfilment of the treaty of *Ghent,* so far as it referred to making indemnity for private property; and for the distribution of the fund received under this treaty, a board of commissioners was created by *Congress.*

The contract then under which the money was paid, was between two sovereign powers, to which *Plater* was no party. His claim on the *British* government for the capture of his property was a mere possibility, dependent wholly upon its will.

There was no *jus prosequendi.* No remedy without which a right cannot be said to exist. 3 *Black. Com.* 123. 2 *Swanst.* 613. The money paid was not founded on right, but on the policy of the nation. The right in *Plater,* if it can be called a right, is analogous to the hope of succession in an heir. 1 *Madd. Ch. Pr.* 549. 3 *Merrivale,* 671. 1 *Preston on Estates,* 75, 76. 4 *Wash. C. C. R.* 576. 1 *Taunt.* 578, 602, 614. 2 *Barn. and Ald.* 242.

If not a mere naked possibility, it was a possibility coupled with an interest, which, by the principles of the common law, cannot be assigned. 1 *Preston on Estates,* 76. 2 *Preston Abstract of Titles,* 93. 4 *Wash C. C. R.* 576.

A possibility coupled with an interest may, it is true, be assigned by the commissioners of a bankrupt, but this power is derived from the statutes of bankruptcy, and not from

the common law. 3 *Petersd.* 488, *in note.* 1 *Pr. Wms.* 132. 4 *Wash. C. C. R.* 570. 1 *Peters'* S. C. R. 219.

The case reported in the authorities last cited, is similar to that now before the court, and the bankrupt's assignee was adjudged to be entitled to the property, not upon the principles of the common law, but because of the bankrupt laws of the *United States,* the 18th section of which is in part a transcript of the *English* statute, and is broad enough, as is also the 5th section, to transfer every description of interest, or *possibility of profit,* growing out of property. But the provisions of our insolvent laws, under which the trustee claims, are widely different. *Act of* 1805, *ch.* 110, *sec.* 1; 1812, *sec.* 6. The words "of every description in law and equity" are omitted; as are also "possibility of interest."

The property and rights mentioned in our laws, are property and rights which can be asserted, and enforced in a court of justice, and not every *possibility* of *profit* and interest.

*Plater,* at the time of his petition had no right to the property in question, which could be enforced in a court of justice. His interest, whatever it might be, depended upon the will of an independent government, which acknowledges no law, but its own sense of right, and bids defiance to any authority but its own. Neither was the fund in question, acquired by "gift, descent, or in a course of distribution:" it was not a pure *donation,* without consideration; but resulted from a treaty between independent nations, providing compensation to individuals whose property was wrested from them during a period of war. In strictness, it can neither be called the payment of a debt, or a gift. 2 *Swanst. Rep.* 613.

If however it can be regarded as property liable for the insolvent's debts, still, it does not go to the trustee, but to the insolvent himself, liable to his creditors in his hands. 2 *Harr. and Johns.* 61.

*Crain*, for the appellee.

The county court did not intend to submit a question of law to the jury. There was no question as to the legality of *Plater's* discharge—It was not discussed or intended to be raised; it being conceded that he was regularly discharged in 1823, upon a petition filed in 1822. If however, this court should decide, that a question of law was left to the jury, (which is not admitted,) still it is insisted that no procedendo should issue, as the final judgment must be the same as the one already pronounced. *State use Johnson vs. Green*, 4 *Gill and Johns.* 381. The manner in which the plaintiff claims to recover this money from the trustee, is disclosed by the record, and this court should think that the claim cannot be supported; there can be no use in sending the record back for another trial. That the claim rested in the trustee for the benefit of the petitioner's creditors, he referred to *Jones vs. Roe,* 3 *Term. Rep.* 88. 1 *Ves.* 98. *Comegys and Petit vs. Vasse,* 1 *Peter's S. C. R.* 193.

But conceding that a doubt may be entertained upon this question, will the plaintiff in this action be permitted to recover from his trustee? This is an action for *money had and received,* which is an equitable action. And the question is, whether the court in this form of action will permit a party to recover a fund, which upon every principle of equity and justice, should be distributed among his creditors, from the payment of whose claims his person has been discharged. The action for money had and received, is governed by the true equity and conscience of the case. *Douglass,* 137, 138. In equity and conscience *Plater* can have no claim to the fund.

By the 5*th sect.* of the *Act* of 1805, *ch.* 110, any property acquired by *gift,* descent, or in his own right, by bequest, devise, or in *any course of distribution,* shall be liable to the payment of the insolvent's debts. The money in question then, having been acquired in a course of distribution, is a fund for the payment of creditors, and being in the hands of the trustee to be so applied, this court will not

permit it to be taken from him, and diverted to a different purpose.

ARCHER, J., delivered the opinion of the court.

We are of opinion, that the court erred in submitting to the jury the question of the legality of *Plater's* discharge under the insolvent laws.

Under the circumstances detailed in the bill of exceptions, the sufficiency of *Plater's* discharge was a mixed question of law and fact.

The right of the permanent trustee of *Plater* to the funds in controversy, arising from the treaty with *Great Britain,* cannot we think be well questioned.

As all claims of the insolvent, are transferred by the insolvent laws to the trustee, we conceive the term claim, sufficiently extensive and comprehensive, to embrace the matter in controversy.

Although the right to indemnity for the deported slaves, could not be enforced by any process whatever, the claim existing against a sovereign power, yet it was not the less a claim on that account. Sovereign states are presumed always ready to do that justice, which, in the case of citizen against citizen, is always coerced by the process of judicial tribunals.

It cannot with propriety be contended, that the lawless deportation of slaves, and plunder of property on our waters during the late war, conferred upon the enemy any right thereto; and the treaty by granting indemnity, furnishes demonstrative proof, that these transactions were contrary to all the usages of civilized warfare.

**JUDGMENT REVERSED AND PROCEDENDO AWARDED.**