FRANKLIN GARDNER *vs.* MARTIN LEWIS, PERMANENT TRUS-
TEE OF WILLIAM HOLTON, SR.—*December* 1848.

Reports of adjudged cases, are not evidence of what is the law of the State or country in which they are pronounced. The written law of foreign

countries should be proved by the law itself, as written, and the common, customary or unwritten law, by *witnesses acquainted with the law.*

The rule of comity is overruled by positive law. If the laws of this State and another State should differ, it cannot be made a question *here* which shall prevail. Where there is no constitutional barrier, our courts are bound to observe and enforce the statutory provisions of our own State.

A nation will not suffer its own subjects to evade the operation of its own fundamental policy or laws, or to commit fraud, in violation of them, by any acts or contracts made, with that design, in a foreign country, and it will judge for itself how far it will adopt, or how far it will reject, any such acts or contracts.

*H* and *G*, citizens of *Maryland*, entered into an agreement in *Washington* city, *D. C.*, by which the former admitted an indebtedness to the latter, and agreed, that certain goods attached by the latter in *Norfolk, Va.*, should be the property of *G*, and directed an order to the officer, in whose custody said goods were, to deliver them to *G;* and also agreed, that certain notes then given by one *T*, in favor of *H*, should be held by *G*, for so much of said debt as the *Norfolk* goods failed to pay. *G* afterwards removed these goods and notes to *Maryland*, and an action of *trover* was instituted against him by *L*, the trustee in insolvency of *H*, (who had in the meantime applied for the benefit of the insolvent laws of *Maryland*,) alleging, that this transaction was in fraud of the creditors of *H*. HELD, that the validity of this agreement must be determined by the laws of *Maryland*.

Fraud and extortion in procuring a written agreement, if established, whether it be technically duress or not, will invalidate the instrument.

If an insolvent could himself successfully impeach an agreement transferring property, for fraud, the property remains in him, and is transferred to his trustee, who then acquires a right to sue for it, and even if the insolvent could not sue for it, being *particeps criminis*, yet the trustee may.

Whether a deed be fraudulently obtained from an insolvent, or be the result of fraud practised upon him, if thereby his creditors are defrauded, the trustee is the person to claim the property in their behalf.

By our laws, all the property of an insolvent, wherever situated, is conveyed to the trustee, and though other States may not so declare in regard to property for which the trustee brings suit in their courts, yet, if the property be brought back to *Maryland*, our courts will regard it as part of the trust fund, to which the trustee is entitled.

Where our statutes declare the deed of an insolvent fraudulent, although our courts cannot meddle with the property while without our territory, still *here*, it is regarded as part of the trust fund, and if it be brought into *Maryland*, they will entertain a suit for it, and in deciding such suit, will be governed by the statutes of *Maryland*, disregarding the *lex rei sitæ*.

It is not necessary for the trustee, in order to recover in *trover* goods fraudulently obtained from the insolvent, to pay or tender to the defendant the money he paid to the insolvent at the time when the fraudulent agreement was entered into, and as a consideration therefor.

*H,* who was in embarrassed circumstances, called a meeting of his credi-
tors, with the approval of the appellant, one of them, for the purpose of
asking an extension of credit. The appellant said he could not attend,
but would send *J,* his clerk, to represent him in "the most favorable man-
ner." At this meeting it was agreed, that nothing could be done without an
inventory of *H's* property, and that he, *(H,)* should go to *Washington,* and
other places where his goods were, to make out one, and *J* and the other
creditors agreed, that in the *interim* (five days,) no legal proceedings should
be instituted against him. HELD:

That *J,* as his agent, was authorised to enter into this agreement for the appel-
lant, and that it was a positive contract binding upon him, and founded in a
sufficient consideration, both on the part of the debtor and the other credi-
tors; and that an attachment issued by the appellant on the goods of *H,* in
*Norfolk, Va.,* the day after this agreement was made, was in fraud thereof.

When creditors assemble for such a purpose as above stated, there is a contract,
*inter se,* necessarily implied, that each shall act in good faith and do nothing
to frustrate the common object, a breach of which is a gross fraud.

The act of 1834, making void conveyances made by applicants for the benefit
of the insolvent laws, does not apply to any case where the creditor or secu-
rity receiving such conveyance, shall appear not to have notice of the condi-
tion of insolvency of the debtor.

The county court instructed the jury, that if they found that the debtor intended
to transfer his property to a creditor by a certain agreement, and at the time
of such agreement, he had no reasonable expectation of being exempt from
liability or execution for or on account of his debts, without applying for the
benefit of the insolvent laws, and that the creditor at the time had notice of
the debtor's condition of insolvency, then such transfer was made under a
view and intent of becoming an insolvent debtor, with intent thereby to give
an undue and improper preference to such creditor, and vested in him no title
to the property. HELD, that this instruction was properly granted.

When any transaction necessarily produces the effect which a statute declares
fraudulent as against creditors, the court may pronounce such act fraudulent.
Whatever is the necessary consequence of an act deliberately done, *that* the
law presumes every man to intend.

APPEAL from *Baltimore* county court.

This was an action of *trover,* instituted by the appellee, as
permanent trustee of *William Holton, Sen.,* on the 29th of
July 1845, against the appellant, to recover certain goods and
promissory notes, the property of *Holton,* the insolvent. The
defendant pleaded *not guilty,* upon which issue was joined.

At the trial, the plaintiff gave in evidence, the record of
*Holton's* application, for the benefit of the insolvent laws.
(By this record it appears, that the application was made on

the 12th of June 1845, and that the plaintiff was regularly appointed his permanent trustee, and bonded as such, on the 14th of the same month.)   The plaintiff then further proved, by said *Holton*, the insolvent, (the witness having first executed to the plaintiff, as trustee, a release of interest, which was admitted to be valid,) that in 1845, witness resided in *Baltimore*, and was engaged in selling made up clothing, and dry good merchandise.   That he had branches of his establishment at *Washington city*, and *Petersburg*, *Virginia*.   That in May 1845, he removed his *Baltimore* stock to *Norfolk*, *Virginia*; that on the 3rd of June 1845, finding himself embarrassed, he consulted *Mr. Hack*, a member of the *Baltimore* bar, who advised him to ask an extension of his creditors; that *Mr. Hack* with witness' assent, despatched written notices to the defendant, the plaintiff, and *Hamilton Easter*, merchants of *Baltimore*, stating that they were respectively invited to a meeting of said *Holton's* creditors, to be held at the office of said *Hack*, at 4, P. M., on the 4th of June 1845; that defendant was his largest creditor; that witness, on the morning of the 4th of June 1845, met the defendant, who said, "I have just been round to see what this meeting is about." Witness told him that he was perfectly solvent, that he only wanted time, but, if his creditors desired it, would surrender to them all his property.   Defendant told witness there could be no difficulty with him, but that he was going under subpœna, as a witness, to *Cumberland*, and would leave *Baltimore* that afternoon at 4 o'clock, P. M.; that, however, he would send his clerk, *Mr. Johnson*, to the meeting, and that he would instruct *Johnson* to represent him in the most favorable terms.

That defendant, afterwards, on the same day, called at the dwelling of witness, and said that he had some business at *Canton*, and would only have time to get back in season for the cars for *Cumberland*; that it was impossible for him to attend the meeting of the creditors, but would send *Johnson* there.   Defendant then advised witness to go that afternoon to *Washington*, there sell out, then to go to *Petersburg*, take an inventory, thence go to *Norfolk*, do the like there, then return to *Baltimore;* that there would be no difficulty.

That witness went to the meeting at *Mr. Hack's* office, and found there the plaintiff and *Mr. Johnson,* on the part of the defendant, and no other creditors, and *Mr. Hack.* Witness was asked, by *Mr. Johnson,* if he had any exhibit of his affairs, witness said he had none; witness is under the impression that *Johnson* said, that defendant had gone to *Cumberland,* and had sent him. Witness stated that he was entirely solvent, and asked of his creditors an extension for twelve or fifteen months. That *Lewis,* the plaintiff, said that nothing could be done without an exhibit, and so said *Johnson. Johnson* said that witness had better go at once to *Washington,* then to *Petersburg,* then to *Norfolk,* and make inventories; and it was calculated, by the parties present, that five days would suffice for this purpose. Witness thinks that *Mr. Hack* asked the question, if, in the *interim,* whilst witness was preparing the exhibit, they would agree, that no legal proceedings should be had, until witness had prepared the exhibit; *Johnson* and *Lewis* agreed to this; that witness went, on the afternoon of the same day, to *Washington;* that on the next morning, whilst in the *Washington* store, engaged in treating with *Tucker* for the sale of the stock there, witness' son suddenly came in, and told him that *Gardner* had been at *Norfolk* on the previous day, and attached the stock of goods there, and turned him out of the store. Witness was surprised, and told *Tucker* that he feared that this proceeding of defendant had made him insolvent, and that he would have no right to go on with the sale to *Tucker;* and with a view to advise on this subject, proposed to go to a lawyer. Tucker recommended *Mr. Hoban,* whom they went in search of, but did not find at his office. That whilst in the *Washington* store, witness saw *Gardner,* on the 5th of June, pass the door; that witness went again with *Tucker* to find *Hoban;* and on reaching his office, saw *Gardner* there, who stepped out to meet witness, that witness then said, "*Mr. Gardner,* I suppose you're come to see me?" He replied, "No sir." Then witness said: "You're come to see my goods then?" "No sir, I have come on quite a different business." Then witness said: "Then you went to *Norfolk,* to see them there — you've turned my son out of doors,

without clothing, and you've reported me as a fraudulent debtor." That witness was much excited, particularly at the treatment of his son. That *Gardner* told witness, "to command his feelings, and he had no doubt, that he could satisfy him; that he had done nothing wrong, taking a mercantile view of the transaction; that he only wanted his fair share with other creditors, and he had only seized the goods at *Norfolk*, to prevent others from doing it, and getting the advantage; that he and witness could manage it all satisfactorily; that if another attachment was issued, the goods would have to remain till November, when the summer goods would be out of season, and the winter goods eaten by moths; that he had not represented witness, as a fraudulent or absconding debtor, in the proceedings at *Norfolk*." That afterwards, on that day, (the 5th of June, *Gardner* again saw witness at the *Washington* store, having come there) with a *Mr. Washington;* that *Tucker* was present; that *Gardner* asked him for a release of the goods, taken under the attachment at *Norfolk*, and then all would be right. Witness said: "I will do what is right." Defendant said, that if *Hamilton Easter* found out the goods had been attached, he would be down upon them; that he had kept it a profound secret." That defendant then said: "I have thought of a plan, you had better sell me the goods that are here, and let me sell them to *Tucker*, that it would look better?" Witness declined this, and said, he would consult about giving the release.

After this, witness again saw *Gardner* at the *Washington* store, when he again asked him for the release. Witness told him that he had concluded to do nothing till he had consulted his creditors in *Baltimore*. Defendant insisted that the release should be given, and slapping his hand on his pocket said, "I'll be d—d if I am not cut and dried for you, and will take the property here. I know that you can sue me for it, but if it costs me five thousand dollars, I will seize the goods and they shall all perish, if you do not give me the release." Witness said he would do what was right. *Gardner* again argued and threatened, and said if there was another attachment, the goods would lie and be all ruined. *Gardner* also

demanded some of the notes of *Tucker* that were to be given for the purchase money on the sale of the *Washington* stock, and said that he did not suppose the goods attached at *Norfolk* would be sold; he hoped defendant would get them again. Witness told him the *Norfolk* goods were worth at least $5000. Defendant said that *Bloodgood* thought they were only worth $3000 to 3500; that if they were sold, the sacrifice would be such that he would not be covered, therefore he wanted some of *Tucker's* notes to protect him. *Tucker* advised me to give the release and the notes, and I finally agreed to do so. Witness' motive was this, after *Gardner* and *Washington* had left the store, at the previous interview to this last one, *Tucker* had told me that *Washington* had asked him if he had any difficulties with *Gardner*, and that *Tucker* had told *Washington* that there were none with him, but with *Mr. Holton*. *Washington* then told *Tucker* that *Gardner* had taken out a replevin for the *Washington* stock; that he *Washington* had seen him do it. At this last meeting *Mr. Hoban* had come to draw up the release. Witness signed the release drawn by *Mr. Hoban*, because witness was told, if he did not, the goods should be seized, and they should all perish. That witness gave defendant three of *Tucker's* notes, each dated 5th of June 1845, at 3, 6, and 9 months, for $300 each, without interest; that *Gardner* gave him by stipulation, $200 in cash, on the first note. This interview was at night. The examination-in-chief was here suspended, and the plaintiff proved, by another witness, the demand by the plaintiff before suit brought in July 1845, of the goods and notes claimed in this action, and that defendant replied that he had no property of the insolvent *William Holton, Sen.*, in his hands.

*Holton* was then *cross-examined.* Witness told *Gardner* he thought he was solvent, and says he thinks he was; that the papers executed in *Washington* were read to him, and he understood them; that he knew that he was not obliged to sign them, and that he had a right to dispose of the goods at *Washington* as he did.

The plaintiff further proved by *Oliver F. Hack*, the same facts in reference to the calling of the meeting of creditors as

stated by *Holton*; that no one attended but *Holton*, *Lewis* and *Johnson;* that *Johnson* said that *Gardner* was out of town, had gone to *Cumberland,* and had sent him to represent him at the meeting; that nothing was done at the meeting, as there was no statement of his affairs prepared by *Holton*. It was understood that *Holton* should go to *Washington* and *Norfolk*, and get a statement of his stock and affairs, and then it would be seen if time should be given to him. *Holton* and witness proposed that no legal proceedings should be had against him during this time, whilst making a statement, and *Lewis* and *Johnson* assented to this proposition. *Holton* said it would take five days. They all left my office under this agreement.

And the plaintiff further offered in evidence, a certified copy of the record in case of the attachment by the defendant at *Norfolk, Va.,* on the 4th of June 1845, by which it appears that *Gardner* in his bill praying for the attachment, stated that *Holton* was indebted to him in the sum of $2413.35, as follows; on seven notes due between the 13th of June 1845, and the 5th of December 1845, the amount of which are stated; "which said several notes, (he avers,) are now lodged in the banks of said city of *Baltimore* for collection, and your orator is unable to file them here with his bill, as he left the said city in a hurry without having time to withdraw them, but will file the same at a proper time hereafter, and in the meantime files an account of said notes, marked A." Besides these notes, the balance of said debt amounting to $233.20, is by open account. The goods were taken under this attachment, and on the 7th of June 1845, delivered to *Gardner*, by virtue of the following order filed in the cause, on a copy of the process.

"*Washington, 5th of June* 1845.

Deliver the goods mentioned and referred to in the process, of which this is a copy, to *Franklin Gardner*, or order.

WM. HOLTON, SR.

To the officer in whose charge or custody said goods are."

*Gardner* then directed the goods to be delivered to his agent, *Johnson,* who took possession of them, and gave a receipt therefor, and on the same day, (7th of June,) the cause was dismissed by order of the plaintiff's ( *Gardner's,* ) counsel.

The plaintiff then further proved that the notes of *Holton* in favor of *Gardner* mentioned in the above proceedings, were discounted by the *Union Bank of Maryland* for defendant, with his endorsements thereon, and were held by the said *Bank* at the time the attachment at *Norfolk* was issued, and were afterwards paid by the defendant as they fell due.

And the defendant on his part, gave in evidence by *Mr. Tucker*, that he was treating with *Holton* for the purchase of the goods at *Washington*, on the 5th of June 1845; that *Holton's* son came into the store, and told him that *Gardner* had been to *Norfolk*, and attached the stock of goods there. *Holton* then said he was not sure of his situation, and of his right to sell the *Washington* stock to witness—that this proceeding might make him insolvent. That witness proposed to advise with counsel, went for *Mr. Hoban*, and not finding him, went again, when on approaching his office, saw him there with *Gardner*, who came to the door and talked with *Holton*. *Holton* asked *Gardner* why he came to *Washington*, if it was on account of his business? *Gardner* replied, "not particularly for that, though since I am here, I can attend to that also." *Holton* invited *Gardner* to come down to the store. *Gardner* came while the appraisement was going on. *Holton* executed the paper to *Gardner*—it was drawn by *Mr. Hoban*, and attested by witness on the day it bears date; the following is the paper.

"Memorandum of an agreement, between *Franklin Gardner* and *William Holton*, *Sen.*, made at *Washington, D. C.*, on this 5th day of June 1845. *Mr. Holton* admits to be due *Mr. Franklin Gardner*, the sum of twenty-four hundred and thirteen dollars and thirty five cents, and hereby agrees, that the goods attached by said *Gardner* at *Norfolk*, in the State of *Virginia*, be owned by said *Gardner*, and received by him, as his own property, from the officer in whose hands they now are; and said *Gardner* agrees, that the notes of *Mr. Tucker*, given and dated this day in his favor, should be held in trust for the use of said *Holton*, in case the said property attached at *Norfolk*, pay the said debt due the said *Gardner*, when the same are disposed of by him, and only so much of said notes

shall be the said *Gardner's,* in any event, as shall remain after sale of said *Norfolk* goods, necessary to make up the amount of said debt.                                    FRANKLIN GARDNER,
                                                WM. HOLTON, SR."

"Witness,—*Sam. W. Tucker.*"

There was a great deal of desultory conversation between *Gardner* and *Holton,* which witness cannot recollect.  *Gardner* told *Holton* that he feared the goods at *Norfolk* would not be enough to cover his claim, and wanted notes, and that he would pay over any surplus there might be.  Some high conversation occurred on this demand.  *Holton* said he wished to consult his creditors in *Baltimore,* and did not know that he would be right in giving the release till then.  *Gardner* would threaten when *Holton* was excited, and argue when he was calm.  *Gardner* said the delay might be too great, that what was to be done, was to be done at once; that even at that very moment it might be too late, and that some creditor might have laid a second attachment on the goods at *Norfolk.*. The conversation went on alternately mild and excited.  *Gardner* used some harsh expressions; said he was prepared for him; that he must close up this matter; that *Holton* had brought this difficulty on himself, by calling his creditors at an attorney's office. . Finally *Holton* agreed to sign the paper, at the persuasions of witness, and to give three of witnesses purchase notes, which were for $300 each, *Gardner* giving *Holton* on them $200 in cash.  *Holton* signed the paper; signed it willingly; that this was about midnight.

Witness, on *cross-examination* said, *Gardner* threatened *Holton* that he would close that business up if it cost him $5000. Said he was cut and dried for him; that not an article of the *Washington* stock should be moved; that he knew *Holton* could sue him, and get damages, but he did not care.  *Holton* said he was afraid the seizing at *Norfolk* had made him insolvent.  The release was written on the 5th of June in witness' presence.  *Holton* would get excited, when his ideas of doing justice would press upon him, and when *Gardner* would urge the giving the release.

And the defendant further proved, by *Mr. Johnson,* that witness was at *Mr. Hack's* office, where he went by direction of defendant, to see what was done; that witness was only instructed to go there and see what was done, and was not authorized to agree to any thing, and would not have felt himself authorized to agree to any terms; does not remember he entered into any stipulation or agreement to forbear proceedings; that it is some time since, and don't recollect very well, but has no remembrance of any agreement; witness got the goods from the sheriff at *Norfolk,* and brought them up to *Baltimore;* that they were sent to *Philadelphia,* and as he understood, sold there. *Gardner* did not tell witness not to enter into any arrangement; he merely told witness, that he, *Gardner,* would be absent, and witness to go there, as he, *Gardner,* could not attend.

The plaintiff then offered in evidence, the account of sales made by the defendant at *Philadelphia,* amounting to $2382.02.

And the plaintiff then offered the following prayers to the court.

1st. If the jury find from the evidence in the case, that *Holton* applied for the benefit of the insolvent laws, and obtained the same, and that plaintiff was duly and regularly appointed permanent trustee of said *Holton,* and legally bonded as such, and that before the institution of the suit, he demanded the property for which the action is brought, of defendant, and that defendant refused to deliver the same to plaintiff; and if they find that the said property was, in whole, or in part, sold by defendant, and proceeds appropriated to his own use; and if they also find, that said *Holton,* as testified by himself and *Hack,* called a meeting of his creditors at *Hack's* office, and that defendant told *Holton,* after receiving notice of such meeting, that he could not attend it, being obliged to go to *Cumberland* as a witness in a case there, but said that he would send his clerk, *Johnson,* to represent him at such meeting in the most favorable manner, and if they further find, that in consequence of which *Martin Lewis,* one of the said creditors, and *Johnson* as agent of defendant, and *Holton,* did attend, and *Johnson* said he attended for defendant because he, defendant,

had gone to *Cumberland*, and did not say, or intimate, that he was not authorized to act for defendant; and if they further find, that it was stated at the meeting, by *Johnson*, that nothing could be then done until *Holton* could make an exhibit of his affairs, and it was agreed, at *Johnson's* instance, that *Holton* should go to *Norfolk* and other places where his goods were, and make inventories of the same, and that no legal proceedings should be had until such inventories were made, and an exhibit was made of his condition by *Holton;* and if they find that defendant, after getting notice of said meeting, when he had his said interview with *Holton*, and when he directed *Johnson* to attend the said meeting of creditors, intended to go to *Norfolk* to attach the property of *Holton* there, and did go for that purpose, and did then attach them, as appears in the evidence, and designedly concealed his intention from said *Holton* and the creditors, under the notice aforesaid, and for that purpose falsely represented that he was going to *Cumberland;* and if they further find, that having attached the said property at *Norfolk,* he went to *Washington,* and there obtained, in the manner stated in the evidence of *Holton,* the order for the *Norfolk* goods and *Tucker's* notes, then the plaintiff is entitled to recover.

2nd. If the jury find the same facts as stated in the preceding prayer, as to the application of the insolvent, the appointment of the trustee, conversion by defendant, and demand and refusal; and if they further find, that at the time *Holton*, in the manner stated in the evidence of *Holton* and *Tucker,* agreed to transfer and assign said property to defendant, and did so transfer and assign, in the manner and under the circumstances stated in the evidence of *Holton* and *Tucker*, on account of the debt due by *Holton* to defendant, he, *Holton*, had no reasonable expectation of being exempted from liability or execution for, or on account of his debts, without applying for the benefit of the insolvent laws of the State, and that defendant had then, notice of the said condition of insolvency of said *Holton,* that then such transfer and assignment was made, under a view, or under an expectation, on the part of *Holton,* of being or becoming an insolvent debtor, and with

intent thereby to give an undue and improper preference to defendant, and therefore vested no title in said property in defendant; and if they further find, that when *Holton* became the debtor of defendant, he and defendant were citizens residing in *Maryland*, and have continued to be such up to the present time, and plaintiff is, in consequence, entitled to recover.

The defendant then offered the following prayers.

1st. If the jury shall find from the evidence, that on the 4th of June 1845, *William Holton, Sen.*, was indebted to *Franklin Gardner*, the defendant, in the sum of $2413.35, upon note and open account, or that the defendant was responsible for said amount in part, on account of said *Holton*, as his endorser, and was a creditor of said *Holton*, for the balance of said sum; and that on the 4th of June 1845, said defendant caused an attachment to issue, out of the circuit superior court of law and chancery, for the city of *Norfolk*, in the State of *Virginia*, against the moneys, debts and effects of said *William Holton, Sen.*, who was then residing in the city of *Baltimore* and State of *Maryland*, that in virtue of said process of attachment, the goods of said *Holton*, in the city of *Norfolk*, which are mentioned in the declaration of the plaintiffs in this suit, were seized by the sheriff of said city of *Norfolk* in the State of *Virginia*; and that whilst so in the custody of the said sheriff, under said process, on the 5th of June 1845, the said *Holton*, at *Washington*, in the *District of Columbia*, executed the agreement of that date offered in evidence, and the order contained in the record of proceedings, offered in evidence by the plaintiff; that in virtue of said agreement and order, the said goods were taken into the possession of the defendant, and that the same were sold by said defendant, for a sum netting less than the debt so due by the said *Holton* to said defendant, that then the said plaintiff is not entitled to recover in this action in respect to said goods.

2nd. If the jury find that said *Holton* was indebted, as shown in the testimony, to the defendant, and that to enforce payment of the said debt, the judicial proceeding was instituted, as given in evidence by the plaintiff, and that thereunder the

goods, the value of which is claimed in this action, were attached, and in the hands of the proper officer, to answer the claim of the defendant, and that said proceeding was afterwards dismissed, by reason of the delivery in *Virginia* to the defendant, of said goods, with the assent of the said *Holton*, and in pursuance of the agreement between *Holton* and the defendant, executed at *Washington*, in the *District of Columbia*; and if they shall find that said agreement was so executed, and while said proceeding was pending, then the plaintiff is not entitled to recover in respect of said goods, notwithstanding the jury should believe, that the said agreement and assent were procured by urgency of the defendant, and by threats of taking the goods of the said *Holton* at *Washington*, spoken of in the testimony in the case.

3rd. If the jury find that said *Holton* was indebted, as stated in the aforegoing prayer, and that to secure payment of said indebtedness, the said *Holton* executed, at *Washington*, in the district aforesaid, at the date thereof, the agreement given in evidence by the defendant, and that the notes for which, in part, this action is brought, are the notes mentioned in said agreement, and were delivered to said defendant for security, as aforesaid, at *Washington* aforesaid, at or before the making of said agreement, then the plaintiff is not entitled to recover, as to the notes, although the jury shall find that said agreement, and said delivery of the notes, were procured by the defendant by urgency and threats, as stated in the aforegoing prayer.

The court, (LE GRAND, J.,) granted the prayers of the plaintiff, and rejected those of the defendant, who excepted, and the verdict and judgment being against him, appealed to this court.

The cause was argued before DORSEY, C. J., SPENCE, MARTIN and FRICK, J.

By NELSON, MAYER, and McMAHON, for the appellant, and By WALLACE and JOHNSON for the appellee.

MAGRUDER, J. delivered the opinion of this court.

The appellee in this case was appointed permanent trustee of *William Holton, Sen.*, an insolvent debtor, on the 14th June 1845, and on the 29th July of the same year, instituted this action in *Baltimore* county court. It is an action of trover, brought to recover the value of goods and promissory notes, which, it is alleged, are the property of the appellee, and had been converted, by the appellant, to his own use. There was a verdict for the appellee, and the record contains exceptions, by the appellant, to two instructions given by the court, at the instance of the appellee, and because of a refusal, by the court, to give three instructions, as asked by the appellant himself.

It appears, from the statement in the bill of exceptions, that this is a controversy between two persons, each claiming to derive title to the property in dispute, from the same person (the insolvent;) both agree that on the 4th June 1845, *Holton* was the owner of the goods and promissory notes, and it appears, continued the owner until the appellee was appointed his trustee, and the title vested in him, unless, before then, the appellant himself had acquired a valid title to the things in controversy, from the insolvent himself. The plaintiff below made out his case, and all the doubt arising in it, is caused by the introduction into it, of the proof of title by the defendant. That title is impeached, and if successfully, then, the defendant has no right. It seems proper, then, to examine the questions in regard to that title, as presented by the prayers of the defendant below.

Before doing this, however, it is necessary to dispose of a question, which, although it is not expressly raised in any of the exceptions, meets us at every point in the case, and perhaps, would materially influence the decision of the case.

The defendant below insists, that the validity of his title depends, not upon the law of *Maryland*, but upon the law of *Virginia;* and with respect to a part of the property, on the law of the *District of Columbia*, inasmuch as the agreement which constitutes his defence, transfers property, at the time, without the territorial limits of *Maryland*, (most of it in *Virginia*,) and is an agreement between persons, who, although at the time, citizens of and residents in *Maryland*, were without

its limits. For these reasons, the validity of it depends, with respect to the goods, upon the law of *Virginia;* and so far as it relates to the notes, upon the law of the *District of Columbia;* no part of it upon the law of *Maryland.* It is contended, moreover, by him, that, according to the laws of *Virginia,* and of the *District of Columbia,* the proof furnished by him establishes a valid transfer, by the insolvent to him, of all the property.

Is there any law of *Virginia* known to us, which may make this a valid transfer of the goods in controversy? Any law of the *District of Columbia,* which can legitimate this transfer of the promissory notes now in controversy?

If the goods in controversy had not been withdrawn by the defendant below, from the protection of the laws of *Virginia,* and the plaintiff was in a court of that State, claiming title to them, and seeking redress for the alleged conversion; and if, as is now alleged, the *Virginia* law makes the transfer by the insolvent to the defendant below, valid, then the plaintiff would have been obliged to invoke to his aid the law of *Maryland,* and to ask the court below, to hear and decide the case, according to that law. What would have been the result, we are not to conjecture. The comity of nations, we are told, (see *Story on Conflict of Laws, p.* 38,) "is derived altogether from the voluntary consent of the latter," (the State, within whose territory it is attempted to make the law of another State obligatory,) "and it is inadmissible, when it is contrary to its known policy, or injurious to its interests;" and it is "only in the silence of any positive rule, affirming, or denying, or restraining the operation of any foreign laws, the courts of justice presume the tacit adoption of them, by their own government; unless they are repugnant to its policy, or prejudicial to its interests." This also, he assures us: "A nation will not suffer its own subjects to evade the operation of its own fundamental policy, or laws; or to *commit fraud in violation of them,* by any acts or contracts made with that design, in a foreign country; and it will judge for itself, how far it will adopt, and how far it will reject, any such acts or contracts." *See sec.* 106.

In answer to all that is urged for the appellant, about the comity of nations, the appellee insists, 1st, that we have no evidence of the existence of this *Virginia* law, which his adversary would invoke to his aid; and 2ndly, that, if its existence was conclusively proved, it does not furnish us with the law, by which this cause is to be tried here, in a *Maryland* court. These suggestions will be considered.

We are so much in the practice of looking into the reports of decisions of the *English* courts, and of our sister States, in order to learn what is our own law, that it may be well occasionally to remember, that these reports of adjudged cases are not evidence to us, of what is the law of the State or country, in which they are pronounced.

We are in this case left in ignorance, whether this law of *Virginia*, which is to direct us in our decision, is that which is to be found in her statute book, or is a part of that unwritten law, which is said to be the birthright of every citizen, and which, in our own State it is declared in the bill of rights, to be alterable, to be sure, but unalterable, except by the legislature of the State. How are we to discover, that *Virginia* has, or ever had any law, written or unwritten, which would give validity to the agreement, made under the circumstances disclosed to us in this case? We are called upon to say, that although this agreement may be, without doubt, fraudulent and void, and must be so pronounced, if this cause be tried by *Maryland* law, yet that the result will be very different, (it will be quite a fair transaction,) if from the law of *Virginia*, we are to learn its character. We have been repeatedly told, that our law of 1834 does not make any part of the law of *Virginia*. Possibly not. But it can never thence be inferred, that by no law of that State, is a transaction like this, declared not to be fraudulent. How then are we to learn, if it be needful for us to know, what the laws of *Virginia*, statute or common, say of a transaction like this? "The court of one State cannot, judicially, take notice of the laws and practices of another," 20 *Pick.*, 472. The written law of foreign countries should be proved by the law itself, as written. *Washington C. C. Reports, p. 2.* But the law of *Virginia*, which is to inform us,

50      v.7

whether this agreement is there deemed a fraudulent or fair one, is probably nowhere to be found among the statutes of that State; at all events, no such statute has been shown to us, and if it be, in whole or in part, unwritten law, then the book last mentioned, in the same page, tells us, that "the common, customary, or unwritten law is to be *proved by witnesses acquainted with the law.*" " They must be proved as facts." 1*st Greenl. on Evid., sec.* 486, see also sec. 409. So far, there is no difference of opinion, it is believed, anywhere. The oldest lawyers in this State cannot remember when, in regard to it, our courts entertained any doubt.

But in regard to the next inquiry, there is some conflict of opinion. In *Mullikin's case,* 1*st Pennsylvania Reports, p.* 125, *Gibson,* chief justice, speaking of the manner of proving a law of *Maryland,* says, "whether the property was bound by the proceedings in *Maryland,* when the attachment was laid, is a distinct and material fact which ought to have been expressly stated, because not only the existence of a foreign law, but the construction which is a part of it is determinable, not by the court, but by a jury." Now if this be true, surely reported cases are not to prove *facts* of this description. We can only know from them that the printer said, that the reporter said, that the judge said, that the law is, as he is made to say that it is. This is equally an objection to evidence by reported cases, if it be offered to the court. But *Justice Story,* in his *Conflict of Laws, sec.* 637, 638, after telling us that "the established doctrine now is, that no State takes judicial notice of the laws of a foreign country, but they must be proved as facts," proceeds, "but it may be asked whether they are to be proved as facts to the jury, if the case is tried at common law, or as facts to the court;" and answers, "it would seem as facts to the latter."

How this subject is understood in this court, will be seen in the case of *Thrasher vs. Everhart,* 3*rd G. & J.,* 242. This inquiry however, is not very necessary in a case like this, in which no evidence is offered either for the court or the jury. Such being the case, we are told in 1st *H. & J.,* 720, what is to be done by us. "No doubt the law of *South Carolina,* must

govern the court in determining upon the operation and validity of this deed, if they are different from the laws of this State. But no proof has been adduced that the laws of *South Carolina* will make this deed a good and valid deed, and without proof the jury cannot find what the law of *South Carolina* is, the court must decide it according to the laws of this State."

We may be told about the *lex rei sitæ*, to which the same answer may be given. It really does seem to be unreasonable to ask any court of *Maryland*, to find out and give effect to any law elsewhere, the effect of which would be, that a citizen of *Maryland* who designed to take the benefit of our insolvent laws by crossing the line which separates this State from the *District of Columbia*, or by going into any adjoining State, (taking with him his property,) may rid himself of all that he owes, and then return to *Maryland*, and rid himself of all his debts.

But of what benefit would it be to the defendant below to prove that there is no law in *Virginia*, like some of our insolvent laws? "The rule of comity," *Kent* says, in his *Commentaries*, *2nd vol.* 407, "is held to be overruled by positive law," and what is deemed the settled law of *Maryland* on this subject, some of the learned men who once occupied our seats, have long since told us. "If the legislative enactment of this State and another State should differ, it cannot be made a question *here*, which shall prevail. Where there is no constitutional barrier, we are bound to observe and enforce the statutory provisions of our own State." 5 *H. & J.*, 100, *Davis vs. Jacquin.*

Having now ascertained, that in the trial of this case, the law of *Maryland* alone is to govern our courts, we proceed to inquire, whether, according to that law, the court below expressed any opinion for which its judgment ought to be reversed. We are first to examine the defendant's proof of title. He has none according to his own showing, unless he acquired it by the agreement of the 5th June—the order of *Holton* the insolvent, to deliver to him the goods, and the delivery of them to his agent a few days afterwards. With that proof, also, have been connected the proceedings of the court in *Norfolk*. These proceedings, however, certainly gave to the appellant no title.

They can be relied upon, only to show a good and valid consideration, for the agreement of the 5th June.

It is contended, that if the jury believe every thing which is proved, of these proceedings, the agreement and consummation of it, then the plaintiff is not entitled to recover in this action. It is believed that the three prayers of the defendant below may be considered in connection.

In noticing these several prayers, it may be assumed, that if the agreement was a fair and *bona fide* one, every thing stated in it in regard to the title to this property, would be incontrovertible. But it is charged that this agreement was obtained by fraud; that it is the result of a system of fraud and extortion, and compulsion, practised by the defendant below upon his insolvent debtor, and ought to be avoided for that reason, and further, that even if binding upon the insolvent, it would yet be fraudulent and void, as against his creditors; that there is proof of an actual, as well as statutory fraud. What is said in regard to the latter, will be noticed when we come to examine one of the instructions, which the court gave at the instance of the plaintiff below.

These prayers require the court to say, that if the facts stated are proved,—the proceedings in the *Norfolk* court, the execution of the agreement, and the dismissal of the proceedings in *Norfolk*, in consideration thereof,—then the verdict of the jury must be for the defendant; notwithstanding any urgency by the defendant below, or threats of taking the goods at *Washington,* whereby the agreement was procured.

1st. Fraud or no fraud, (not statutory fraud,) is an important question in the case; upon the decision of this depends, in a very great measure, the plaintiff's right to a verdict. There is certainly testimony *tending* to establish the charge of fraud and extortion in procuring this agreement, (the essential *title paper* of the defendant below,) which, whether it be technically duress or not, if established, may invalidate this instrument. 2 *Greenleaf's Evidence* 331. There may have been " a species of necessity, which acted upon and constrained the will, and being under the necessity of choosing one, he chooses the least pernicious of the two."—" It may be a case in which the

rule cannot be said freely to exert itself, being rather passive than active; or if active, it was so, rather, in rejecting the greater evil, than in choosing the less?'' Notwithstanding all this, it is insisted, that the defendant below must recover, because of the agreement, and the consideration for it, and the dismissal of the proceedings in *Norfolk.* The result of these proceedings, if brought to a decision, it is said, cannot be doubted, and this too, although we are furnished with no means of judging, but the *ex parte* statements of the defendant below, and these statements admitted to be erroneous, in, at least one essential point—the ownership of the notes. But how was the debtor benefited? He paid his debt, it is said; but it was paid to the wrong persons: he got his property released, but, not for himself; it was to become the property of the defendant below.

With all this evidence it is not quite clear that such an agreement transferred the notes and goods even as to *Holton*— at all events the court could not so determine. If *Holton* could successfully impeach the transaction, for fraud, the property was still his, until it was transferred to his trustee, who then acquired a right to sue for it. But if the insolvent could not sue, if he is to be regarded as *particeps criminis,* would it thence follow, that the trustee could not? Whether a deed be fraudulently obtained from an insolvent, or be the result of a fraud practiced upon him, if thereby his creditors are defrauded, the trustee is the person to claim the property in their behalf. In the latter case it is obvious, for the former the act of 1816, ch. 221, has provided. *See,* also, *Kolb vs. Whitely,* 3 *G. & J.,* 188.

All the property of an insolvent, wherever situate, is conveyed to the trustee; and although it may not be quite certain that all other States will so declare, in regard to property for which the trustee brings suit in their courts; yet if the property to which the trustee thus becomes entitled, be brought back again to *Maryland,* it is not for our courts to say, what foreign courts would declare of the deeds of insolvents, so far as they transfer property, which, at the time, was without our territories, When *Plater,* in the case in 6 *G. & J.,* 116, took the benefit of

our insolvent laws, his claim against the government of *Great Britain* certainly was not within the limits of *Maryland:* yet this court had no hesitation in deciding it was a part of the trust fund, and the trustee was entitled to it. So too, if our own statutes declare that a deed of an insolvent is, (for reasons proved to exist in the case,) fraudulent, although our courts cannot meddle with the property while without our territory, still, *here*, it is regarded as part of the trust fund, and if it be brought into *Maryland*, they will entertain a suit for it; and in deciding it, will be governed by the statute of *Maryland*, disregarding the *lex rei sitæ.*

With such proof in the cause, we must forget all that was said in the case of *Davis and Calvert, 5 G. & J.*, 303, 304; and in various other cases, before we can condemn the decision of the court below, in regard to the three prayers of the defendant below.

It has been contended, that even although the agreement was fraudulent, and the plaintiff had a right to claim the goods and notes, still he could not recover, without proof that he paid or tendered the money, ($200,) which the defendant below paid to the insolvent, at the time of the execution of the agreement. Here we are reminded of the doctrine of *Lord Munsfield*, that trover is an equitable action, and for this reason only, (if for this reason,) it is believed, can a tender of this money be insisted upon. In order to a decision of this question, it seems to be quite unnecessary to ask, whether trover is an equitable action, or what, in later decisions, has been said on this subject. Equity does require in every case of usury, that the principal, with legal interest, be paid or tendered, before it will relieve, at the instance of the debtor. But can equity ever require a return, or tender by the trustee, or the creditors in this case, of the money, which seems to have been the consideration of this agreement? The contest is between the creditors of the insolvent, and his grantee; the former alleging, that the money paid to their debtor, was paid by the latter in order to defraud them. Now if the fact be so, upon what principle of equity can a fraudulent grantee claim, that those who complain of the fraud, shall return money paid, not

to the persons complaining, but to their debtor, in order to induce him to defraud them. Surely such a defence is against all equity. It is true, that he who asks equity must do equity. But what equity is there in asking of creditors, who claim to be defrauded by one of their number, that they refund all that the defrauding creditor deemed it expedient to use, in order to accomplish his design of defrauding them? It is quite enough that he be allowed to participate in the fund, when it is recovered.

We are next to examine, if there be error in the first instruction which was given by the court.

To this instruction it is objected, that the contract, into which *Johnson*, in behalf of the defendant below, entered, was not binding upon the latter, because he had no authority to make such an agreement; and moreover, if he had the authority, there was no consideration for it: it was *nudum pactum*.

It is in proof, that a meeting of the creditors of *Holton* was proposed by him, and approved of by the defendant below. The meeting was, to be sure, for the relief of their common debtor, but with the hope of benefiting thereby, the creditors themselves. It was to ascertain, whether, by giving to *Holton* the indulgence which he asked, his creditors might not be secured the amount due to each of them. All parties, it was possible, might profit by it, and with a view to ascertain if such was likely to be the case, a meeting was contemplated. It could not but be known to those who knew of the meeting, and were interested in it, that, in order to a final adjustment of the business, it might be necessary again to assemble. Such was soon discovered to be the case, and a postponement was found to be necessary, not (as far as we can learn,) because so small a number attended as soon as the others did, but because if all the creditors had been then present, nothing definitive could be done, for want of an inventory of the goods then at the several places named. *Holton* says *Johnson* remarked, that he (*H.*) had better go to *Washington*, &c., and make inventories, and that five days would suffice for the purpose; and *Lewis* and *Johnson* agreed, that in the *interim* (that is,

according to their calculation, during five days thereafter,) no legal proceedings should be had. Here then, is a positive contract, that neither *Gardner* nor *Lewis* should seize any of the goods, by attachment or otherwise; and the attachment issued in *Norfolk* was in fraud of that agreement; so that the only question is, whether the defendant below was bound by such agreement, to which his agent was a party ?

If this be regarded as an agreement with *Holton*, surely there was a sufficient consideration for it. The journeys which he agreed to take; the time during which he agreed to be employed, in and about the business which they required of him, and the money he must necessarily expend, in journeying to these several places, and while in them, made the agreement a binding one, if for no other reason, it can be invalidated.

But the defendant himself was not at the meeting, and his agent, it is supposed, had no authority from him to enter into such an agreement. What then, was he authorised to do ? He was to represent the defendant "in the most favorable manner," and this, to be sure, did not mean that he was to execute bonds, purchase farms, &c., for him whom he represented; but *Mr. Johnson* was at that meeting to be *Mr. Gardner*, while acting upon the business for which they had assembled; and a necessary part of that business surely was, not to dispatch it at once, that evening, when it was to be presumed that some delay would be necessary; and it was in proof that the defendant below supposed those inventories to be necessary, in order to enable the creditors to judge, whether for their own advantage and to secure their own debts, the indulgence asked by the debtor, (that is, that his creditors would not institute any legal proceedings against him, for twelve or fifteen months,) should be given him. Can it be said that such an agent was not authorised, at such a meeting, to act upon, or to make, in behalf of *Gardner*, every proposition which was made in the course of that evening ?

For the contract entered into with the debtor, there was a sufficient consideration. But when creditors assemble for such a purpose, is there no contract, *inter se*, necessarily implied,

and a breach of which is a gross fraud? They convene to transact business, by which each hopes to save—some more, some less—money; and in order to the accomplishment of the object of each, it is essential that each should act with the utmost good faith, do nothing whatever, which, if done, would frustrate the object of the meeting. A negotiation is set on foot; and pending such a negotiation, can any one of the parties to it be allowed, with impunity, to practise such a deceit upon the others, and thereby wrong every other person, who, by the practice of such a deceit, suffers a pecuniary loss?

The defendant in the court below, according to the testimony, approved of the meeting, and told *Holton*, and of course, authorised him to say to the other creditors, that there could be no difficulty with him, and that the man who was to be there to represent him, would be there to agree to the most favorable terms.

But few of the creditors, however, attended, and is it usual, or expected, that all the creditors will attend such a meeting? If one chooses to make a promise, which would be obligatory upon him, provided all of them did attend, is that promise utterly null and void, by reason of the absence of some from a particular meeting, and although the promise is not made to depend at all upon the number of creditors who attended, or the amount of debt which was represented? It is surely binding, until notice is given to all others really interested, that the party who promised is no longer to be bound. How else is such business to be transacted? How is any one of the parties to know, whether he is yet bound or not bound, if any one has the right, without giving notice, to absolve himself from his promise, and to act in direct violation of it? He may, indeed, by his promise, verbal or written, agree to be bound, only when a certain number of the creditors, or those holding a certain amount of debt, bind themselves also, but the promise being otherwise, he cannot act as if it were so.

Having promised to indulge, if others would, was he under no legal obligations to keep the promise, even one day after it was made, and when no one had authorised him to suspect that, to the the terms, any one of the creditors had any objec-

tion? And who are the parties now complaining of the breach of faith by the defendant below, whereby they are damnified and deprived of their proportion of the assets of their debtor? All the creditors who are here, suing by him whom the law appoints to institute the suit, and to such an action, is it any defence to say, that any of the creditors lost their right to complain of the fraud, because they had not agreed to indulge their debtor a very few hours indeed after the defendant sanctioned the proposition made by the debtor? He practised a deceit; by the practice of it, he wronged and defrauded the other creditors, and has secured to himself thereby, considerable profits, which it is against equity and conscience that he should retain. Upon what principle then, can it be insisted, that the proceedings at *Norfolk* did not amount to a fraud, practised, both upon the debtor and his creditors, the defendant himself being one of them, and as such, entitled hereafter to claim his just proportion of the assets in controversy? Can he (the defendant below,) set up such a defence, in bar, to this action, when, but for the title so acquired, he would have no defence to this action?

As the case is understood, the plaintiff below charged the defendant with more than one description of fraud. The allegation seems to be that the insolvent was sometimes a party designing to cheat his creditors, and then he is associated with the defendant, at other times as the party cheated by the defendant below, then acting *single handed*. The fraud alleged sometimes to be practised, is statutory, and at other times, other fraud.

In the second instruction given by the court below, the charge, is that the agreement, although the insolvent was *particeps criminis*, is declared to be fraudulent by our insolvent system. We will now examine this transaction in order to ascertain if the law of 1834, does not condemn it.

Certain conveyances, &c., made or allowed, or caused to be made, whether upon request or otherwise, shall be declared to be made with intent to give an undue and improper preference. Whose conveyances are by this act declared to be so made? The conveyances of applicants for the benefit of our insolvent

laws. Are all conveyances &c., made by them, declared to be so ? No: only those which are made in favor, or with a view to the advantage of or security, or with intent to prefer, any creditor or creditors, security or securities, of such applicant; and provided such applicant shall have no reasonable expectation of exemption from liability or execution for, or on account of his debts, without applying for the benefit of the insolvent laws. The conveyance, assignment, &c., must not be for valuable consideration; and that law is not to apply to any case where the said creditor or security (receiving the conveyance, &c.,) shall appear not to have notice of the condition of insolvency of said debtor. The language of the act of Assembly, is certainly sufficient to comprehend the instrument, which the defendant below says is his title paper. The facts, which if they exist will make this paper fraudulent and void, must be proved to the satisfaction of the jury; only *de jure respondent judices.*

We are not now disposing of a motion for a new trial. We need not then stop to enquire what proof the record furnishes of a valuable consideration for this instrument of writing, or whether defendant below had notice of the debtor's condition of insolvency; whether the alleged promise to dismiss the proceedings in court, was any consideration for an agreement, which made the party promising, the owner of every thing which he could properly recover by prosecuting the suit. Neither are we to enquire whether there was any thing like certainty in the result of the suit, wherein the plaintiff in order to obtain an attachment and seizure of the goods, swore that he was the owner of the notes, which constituted so large a portion of his claim, when in truth he was not; and although not the owner, he was claiming the amount of them, when not one cent of that amount could rightfully be demanded by or paid to him; and without due diligence on the part of the owner of them, in demanding payment and giving notice of the non-payment, the defendant below never would be responsible for one cent of them. These and many other matters of fact might be considered by the jury, in judging of the matters in issue, which are now settled by their verdict, unless that verdict was the result of a misdirection or improper refusal to instruct the jury in

some matter of law, needed to assist them in finding the matters in issue.

What question then does the second instruction present to this court? what are the objections to this instruction as given by the court below? We are told in one of the points filed, that it takes from the jury the intent to prefer by the transfer of the agreement; puts the validity of the transfer solely upon the fact of the transfer, the want of reasonable expectation of being exempted, on the part of *Holton*, and the notice of his condition by *Gardiner*, and asks the court to declare that the intent to transfer is the legal consequence of these.

The jury are to find the intent to transfer, as stated in the testimony of *Holton* and *Tucker*, and in addition thereto, that at the time of the agreement, *Holton* had no reasonable expectation of being exempted from liability or execution for, or on account of his debts, without applying for the benefit of the insolvent laws; that the defendant had notice of *Holton's* condition of insolvency. If they found those facts, they were instructed, that such transfer was made under a view and expectation of becoming an insolvent debtor, with intent thereby to give an undue and improper preference to the defendant, and vested in defendant no title to said property.

It is not, and cannot be denied, that there was testimony before the jury, which had a tendency to prove the facts of which they were to be satisfied.

There is no doubt, that if any transaction necessarily produces the effect which a statute declares to be fraudulent, as against creditors, the court may pronounce such act to be fraudulent. Whatever is the necessary consequence of an act deliberately done, *that* the law presumes every man to intend. It is said, *Conn. Reports*, 296, that "when the effect of an act, understandingly done, is necessarily injurious to the rights of another, the *quo animo* is not a matter of fact, it becomes an inference of law."

It is one question, whether the facts and circumstances, which, if they exist in a case, constitute a fraud, are proved to exist in that case. If their existence be shown, the law says, and it is the province of the court to pronounce the law

to be, that they constitute a fraud. This appears by the authorities which were cited at the bar.

When the insolvent executed a deed, by which he designed to transfer to one of his creditors so large a proportion of his effects, and in satisfaction of the whole of his debt, and had at the time no reasonable expectation of being exempted from liability or execution for, or on account of his debts, the court may well say, that such deed vested no title in the defendant, and if they find, that when *Holton* became the debtor of defendant, they were citizens, residing in *Maryland,* and have continued to be such up to the present time, the plaintiff is entitled to recover.

The instruction does not make the validity of the transfer to depend upon the fact of the transfer, but upon the want of reasonable expectation at the time of being exempted from liability or execution for his debts but by applying for the benefit of the insolvent laws, and the knowledge then had by the creditor of the condition of insolvency of the debtor.

JUDGMENT AFFIRMED.